1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,     )
                                  )        Case No. 20CR3235-JAH(DEB
5              Plaintiff,          )        Case No. 20CR3236-JAH(DEB)
                                  )
6   VS.                           )        San Diego, California
                                  )
7   TODD MATTHEW JOHNSON,          )        Thursday,
                                  )        November 5, 2020
8              Defendant.          )        10:55 a.m.
    _____)

9

10

11          TRANSCRIPT OF DETENTION HEARING
        BEFORE THE HONORABLE DANIEL E. BUTCHER
12          UNITED STATES MAGISTRATE JUDGE

13   APPEARANCES:

14   For the Government:      CONNIE WU
                             Assistant U.S. Attorney
15                           880 Front Street
                             San Diego, California  92101
16
     For the Defendant:      EZEKIEL E. CORTEZ
17                           Attorney at Law
                             550 West C
18                           Suite 620
                             San Diego, California  92101
19

20

21

22   Transcript Ordered by:   EZEKIEL CORTEZ, CJA

23   Transcriber:             Cameron P. Kircher

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription.
25

COMPUTER-AIDED TRANSCRIPTION

2

1           San Diego, California - Thursday, November 5, 2020

2                         10:55 a.m.

3           THE CLERK:  Calling Matter 26, 20CR3235 and

4   20CR3236, U.S.A. vs. Todd Matthew Johnson.

5           MR. CORTEZ:  Good morning, your Honor.  Ezekiel

6   Cortez on behalf of Mr. Johnson, who is present via

7   videoconference.

8           Hello, Todd.

9           THE DEFENDANT:  Hi.  How are you?

10          MR. CORTEZ:  I'm very good.  First time I get to see

11  you.  I've spoken to your entire family already.

12          THE DEFENDANT:  Yeah.  I'm fully aware of that, and

13  I'm totally confident in you to make the right choice right

14  now.

15          MR. CORTEZ:  Thank you.

16          MS. WU:  Good morning, your Honor.  Connie Wu on

17  behalf of the United States.

18          THE COURT:  Thank you.  Good morning, Counsel.

19          Mr. Cortez, as part of your conversations, have you

20  spoken to Mr. Johnson about his right to appear in person?

21  Is he prepared to waive for today's purposes and proceed by

22  video?

23          MR. CORTEZ:  I have not.  This is the very first

24  time I've seen him, but he consents I know through the family

25  who told me that.

3

1          THE DEFENDANT:  Yes, I consent.

2          THE COURT:  And I understand, Mr. Johnson, that

3    you've spoken to likely an attorney from Federal Defenders

4    about this as well, right, about your right to appear in

5    person?

6          THE DEFENDANT:  Yeah.  Yes, your Honor.

7          THE COURT:  Okay.  Thank you.  Based on your

8    consent, we will proceed by video.

9          This is the time --

10          THE DEFENDANT:  Thank you.

11          THE COURT:  -- set for Mr. Johnson's detention

12    hearing.

13          Mr. Cortez, are you ready to proceed with the

14    hearing, sir?

15          MR. CORTEZ:  I am, your Honor.

16          THE COURT:  Thank you.  Ms. Wu.

17          MS. WU:  Yes, your Honor.

18          The government has moved to detain based on both

19    serious risk of flight as well as danger to the community.

20    This is a presumption case, and Mr. Johnson has been charged

21    with a ten-year mandatory minimum.  He is not safety-valve

22    eligible, and even without the ten-year mandatory minimum,

23    his low end of the guidelines is over ten years.

24          The evidence in this case, while the least

25    significant factor, is overwhelming.  This stems from a

4

1   long-term investigation into white supremacist gangs in

2   San Diego.

3            And the charges are based on wiretaps and physical

4   surveillance and controlled purchases that were conducted on

5   November 16th of 2018, December 13th of 2018, February 19th

6   of 2019, March 29th of 2019 and May 1st of 2019.  In each

7   case, the quantities of methamphetamine that were being

8   distributed were usually one ounce, or on the last one that I

9   mentioned in May of 2019, was a purchase of six ounces of

10  methamphetamine from Mr. Johnson.

11           The United States recognizes that he has several

12  factors that would weigh in favor of a bond in this case, and

13  I just want to take a quick moment to acknowledge those

14  factors before I focus on why the United States believes so

15  strongly that the presumption cannot be rebutted in this

16  case.

17           He has apparently excellent physical and mental

18  condition.  He has lifelong ties to this district.  His

19  family and children are here.  He has been employed for

20  apparently at least ten years.  And his father has already

21  offered to be a surety for him, and that he has a significant

22  amount of money from the documents I've seen from Mr. Cortez.

23  He, I believe, owns his home and also has over $100,000 in

24  cash in his bank account.

25           THE COURT:  You're referring to the father?

5

1          MS. WU:  Yes.  The potential surety that was

2     proposed to me over e-mail.  But I'm sure Mr. Cortez can

3     comment further on that.

4          MR. CORTEZ:  I will.  I will.

5          MS. WU:  He has lived in San Diego his entire life,

6     and Pretrial Services did not know of any drug or alcohol

7     abuse.  He does not have, to the government's knowledge,

8     failures to appear in court.

9          However, speaking to the other factors, most

10    notably, character, past conduct and criminal history.  I

11    would note that Mr. Johnson is the shot-caller for the

12    Supreme Power Skins, which is a white supremacist group here

13    in San Diego with a very violent reputation.

14         This gang, as well as other gangs that he associates

15    closely with, all answer to the Aryan Brotherhood, which is

16    the primary controlling white supremacist gang, started out

17    as a prison gang, but now has influence outside of prison as

18    well through subordinate gangs like SPS.

19         Through the course of several wiretaps and through

20    wire and electronic intercepts, as well as physical

21    surveillance, the United States was able to determine that he

22    also goes by the -- he goes by a Facebook profile name by the

23    name Bobby Himmler, which the United States believes is a

24    reference to a -- the highest-ranking commander in the SS in

25    Nazi Germany, and he was the leading architect of the

6

1   Holocaust.  That is an account that he uses and that belongs

2   to him.

3          With respect to his past conduct, he does have

4   criminal history that makes him ineligible for safety valve.

5   And looking at not just his convictions, but also his

6   arrests, he clearly has a history of violence.

7          He has a conviction from 2000 for grand theft from a

8   person.  He received two years for that.  He has a robbery

9   conviction from 2002 for which he received three years.  And

10  he also has a misdemeanor driving related in 2011.  And he

11  has one probation revocation that resulted in a prison

12  commitment of two years, and that was back in 2000;

13  recognizing that that was a long time ago.

14         However, his conduct is extremely alarming for the

15  government and involves a significant amount of violence.

16  And this is information that the Pretrial Services officer

17  would not have had access to and so, you know, could not have

18  factored into their analysis on their bail recommendation.

19         But on May 18th of 2019, Mr. Johnson learned that an

20  assault had occurred on an Aryan Brotherhood main member in

21  San Diego by the Peckerwoods Outlaw Motorcycle Gang, and that

22  assault occurred at a Harley-Davidson Motorcycle dealership.

23         When he learned that this assault had occurred to

24  his close associate, he reached out to several gang members

25  and associates to meet him at the assault location.  He

7

discussed the fact that he was armed with a gun as he was
going, that he was racing over at -- driving over 95 miles
per hour to get there, that he couldn't wait and that he
said, "I want blood."

As a result, a lot of law enforcement was deployed
to the area and made their presence known, and luckily no
assault occurred.  And the investigators attribute that to
the strong law enforcement presence at the scene.

Another specific incident that the government is
aware of is from June of 2019.  In this case, Johnson
initially began as a victim of an assault, but obviously
escalated from there.  He was intentionally rammed by
another -- by a gang member who believed that Mr. Johnson was
somebody else.  And this assailant believed that he was
getting revenge on another individual that had assaulted him.
When he rammed Mr. Johnson's vehicle and they pulled over,
the other individual had a baseball bat and Mr. Johnson
pulled out a knife.

Now, in that situation, it does obviously sound like
he was not the instigator, but to get revenge, he,
Mr. Johnson, recruited nine comrades and gang members who
then subsequently all came to his residence and they were
determined to hunt down his assailant.

And in the surveillance of the individuals that
arrived, it was clear that these were gang members and at

8

1    least one of them had recognized neo-Nazi paraphernalia.  He

2    was wearing a shirt with the signature SS lightening bolts.

3         This individual appears to have been spared only by

4    the simple fact that they couldn't find him on this evening.

5    And what they did find instead was his motorcycle, and they

6    ended up stealing that motorcycle and discussed further plans

7    to exact their vengeance.

8         So it is for these reasons that the government

9    believes that there are no conditions or combination of

10   conditions that could reasonably assure his appearance as

11   well as assure the safety of the community.

12        And I think it's important to note in this context

13   that safety of the community -- that danger to the community

14   is not defined by a threat of violence, per se, though

15   Mr. Johnson obviously has engaged in or sought out violence,

16   if not engaged in violence based on his past conduct and

17   criminal history, but his drug trafficking is itself a danger

18   to the community, his repeated drug trafficking is a danger

19   to the community, and that is something that multiple

20   circuits have acknowledged.

21        And in, you know, many instances, we will hear from

22   the defense bar, oh, but it's such a small amount of drugs

23   compared to what you see coming across the border, 45

24   kilograms there, 100 kilograms there.  But then what we also

25   hear from defense is that those people were just couriers.

9

1    They were not drug dealers.  They were not distributors.

2    They are not the ones that are dealing the poison in our

3    communities.  And here Mr. Johnson is a dealer, he is a

4    distributor, and that is something he does frequently.

5         And so it is for these reasons that the government

6    is seeking detention on both grounds.

7         THE COURT:  Thank you, Ms. Wu.

8         Mr. Cortez.

9         MR. CORTEZ:  Thank you.

10        Without having a mini jury trial before the Court

11   and focusing on the actual facts that are before the Court,

12   the Pretrial Services report, which has all the good

13   information that government Counsel was kind enough to admit,

14   I will first focus on the actual indictment before the Court.

15        But before I do so, I'd like to ask the Court not to

16   take into account allegations by the government of neo-Nazi

17   memberships, of white supremacists memberships, because those

18   issues I would say are unconstitutional when you consider

19   them in setting bail for individuals.

20        I've represented a variety of gang members; many of

21   them made bail.  So right now, I really believe that those

22   are just allegations, and I know they are just allegations,

23   and let me tell you how I know.

24        The indictment that's actually before the Court,

25   both indictments, do not have any of these allegations of

1    violence.  From government counsel's allegations -- and

2    that's all they are right now -- the incidents she lists of

3    violence from May and June 2019, they could have been charged

4    in a federal indictment, but they were not.

5         So the charges that are before the Court, the

6    subject matter for the bail and the detention issue are

7    rather routine.  They are one, two, three, four, several

8    instances that go back two years, two years ago.  They have

9    specific instances where they allege Mr. Johnson sold or

10   distributed relatively small amounts, relatively small

11   amounts to individuals, and that's pretty much what the

12   indictment alleges.

13        Before the Court is whether bail should be set for

14   an individual who's charged with a series of less than ten

15   sales that go back two years ago.  That's the real indictment

16   before the Court.

17        The second indictment alleges something very weird.

18   You and I go back a very long time.  So why do I say that?

19   Because I know a little bit of federal law.  The second

20   indictment that was secret alleges aiding and abetting a

21   felon in the possession of a weapon.

22        Mr. Johnson himself, as the government argues, is a

23   felon.  Yet, that indictment does not charge Mr. Johnson with

24   actual possession as a felon of a gun or a firearm, just

25   aiding and abetting.  That itself is a little bit

11

1   unconventional, let's say.

2          Before the Court is an individual who has extremely

3   strong roots to the community.  The rap sheet that Pretrial

4   Services was kind enough to provide, and glossed over by the

5   government, shows something that is very telling.  Those are

6   facts, and what is that that's very telling.  The last

7   criminal conviction that this man has suffered is from 2011,

8   nine years ago.  Nine years ago.  That was a misdemeanor.

9   Before that, you have a felony conviction that goes back 18

10  years.

11         How is that relevant for today's hearing?  It's

12  relevant because despite this specter and dark shadows of

13  violence and knives and guns and Aryan Brotherhood and

14  supremacy and all that stuff, you don't have a single

15  assault, you don't have a single possession of a firearm, you

16  don't have anything in nine years.  Those are facts.

17         Now, what the government proffers to the Court

18  seeking detention in a case that routinely gets bail, by the

19  way, and you know that, is not proven fact.  And it is

20  surprising that a citizen of this country, that the federal

21  government, with surveillance and investigation and wiretaps,

22  didn't charge those facts of crimes as a pattern of

23  racketeering.

24         So I say to the Court that this is a perfect case

25  for bail.  You have a surety, this man's father, his name is

12

1   Fred Johnson.  We provided all of our bail packet to the

2   government yesterday.  Fred Johnson, again, Mr. Johnson's

3   father, him and I have spoken since Monday.

4          Todd Johnson has very strong family support.  I

5   spoke to his common-law wife yesterday, the day before.  They

6   are all supporting Mr. Johnson, and they have very, very

7   strong family ties.  In addition, I received a phone call

8   from a retired judge who knows the family, and he was willing

9   to help in any way he could.

10         Now, Mr. Johnson is presumed to be innocent right

11  now, the weight of the evidence is the least of the factors.

12  The issues are:  Is he going to flee the community if

13  released?  There is not one iota of evidence that he ever has

14  jumped bail.  At the same time, I didn't -- maybe the

15  government is also asking detention based upon danger to the

16  community, a clear and convincing standard.  I dare say they

17  are nowhere near the proof required for that type of request.

18         So what we propose to the Court is almost identical

19  to what Pretrial Services, experienced people who do these

20  things every day.  They know about white supremacy.  They

21  know about violence.  They know about all these things.  They

22  recommend, in full contrast to this government's allegations,

23  a $10,000 bail supported by a financially -- a financially

24  responsible person.  10,000.

25         I would ask the Court to set a personal surety bond

COMPUTER-AIDED TRANSCRIPTION

13

1    of whatever amount the Court thinks is appropriate, secured

2    by the father's own signature as a family relative.  Very

3    reliable.  He has $135,000 in savings right now.  I have the

4    bank records to show that.  He also is the owner of his own

5    home.  The home is worth, conservatively speaking, $750,000.

6    And it's fully owned.

7            So Fred Johnson, the father, has almost a million

8    dollars.  And I dare say because he is the father, he would

9    be a good surety.  At the same time, the Pretrial Services

10   report documents how Todd Johnson has been employed for a

11   very long time at the same employment, and he has -- there is

12   not one negative instance in five years.

13           So I really believe this is a case for bail, and

14   we'd ask the Court set bail.

15           MS. WU:  Your Honor, may I respond to one point?

16           THE COURT:  Yes.

17           MS. WU:  Counsel spoke at great length about the

18   fact that Mr. Johnson is charged only with aiding and

19   abetting with respect to the felon in possession, and the

20   facts of that I think bear discussing.

21           Mr. Johnson was contacted about a potential gun deal

22   that will require Mr. Johnson's assistance because the

23   firearms, the four firearms were located at somebody else's

24   house.  So Mr. Johnson was tasked with going to get those

25   firearms from that individual's house and then pass them off

14

1    to the defendant No. 1, who remains at large today.

2            But defendant No. 1 was the one that was -- after

3    the exchange had taken place, was the one that was in

4    possession of the firearms as he was driving away from the

5    hand-off.  So while he is charged as an aider and abettor, it

6    is certainly not due to a minimal participation in this

7    illegal gun transaction.

8            And, you know, the only other thing I would say is

9    that the United States is here to present based on proffer,

10   just like the defense is.  And so, you know, we are -- both

11   sides are allowed and both sides have alleged facts that were

12   not before the Pretrial Services officer but for which both

13   sides have a good-faith basis to make those proffers.

14           And as I have stated, the United States' proffers

15   are based on actual recordings of Mr. Johnson through

16   interceptions, based on physical surveillance of the events

17   that I have described and based on controlled purchases that

18   were conducted in furtherance of this investigation, which

19   have been audio and video recorded where possible.

20           So to that extent, the United States would just like

21   to make sure the Court understands the basis for the

22   government's proffer on all the facts.

23           MR. CORTEZ:  Very briefly.

24           Your Honor used to be an Assistant U.S. Attorney in

25   the very office that government Counsel now works.  You're

15

1  completely familiar with all those concepts.  That changed

2  nothing.  This man is presumed innocent.  The weight of the

3  evidence which she keeps relying upon by spicing it up with

4  Aryan Brotherhood and white supremacists, it changes nothing.

5        He is not charged with those serious crimes.  They

6  could have charged that.  You know that; you were an

7  Assistant U.S. Attorney.

8        That's all I have.

9        THE COURT:  So follow-up question for you,

10 Mr. Cortez.

11       Where do you propose or contemplate that your client

12 will reside if I were to set conditions of release?

13       MR. CORTEZ:  He will reside at his own home with his

14 common-law wife and children.  I believe he may -- I'm not

15 completely sure about whether he owns his property or not.  I

16 have information that he may have.  But he's been living

17 there for a very long time, and Pretrial Services has already

18 confirmed that.

19       THE COURT:  That's in San Diego County?

20       MR. CORTEZ:  Yes, sir.

21       THE COURT:  Thank you, Counsel.

22       MR. CORTEZ:  Thank you, your Honor.

23       THE COURT:  I've heard a presentation from both and

24 I am prepared to rule.

25       As a preliminary matter, I do accept the proffer by

COMPUTER-AIDED TRANSCRIPTION

16

1    Ms. Wu, and I do consider, even though not charged, the other

2    issues that she believes pertain to dangerousness to the

3    community.  However, having said that, I am denying the

4    United States' motion.  I think there are conditions of

5    release that I could set that would, No. 1, reasonably assure

6    Mr. Johnson's appearance in court as ordered; and, secondly,

7    protect the safety of the community.

8         The conditions, however, are going to be, I should

9    say, somewhat onerous.

10        MR. CORTEZ:  I understand.

11        THE COURT:  So Mr. Johnson, please pay careful

12   attention, sir.  I'm going to give you your conditions of

13   release.

14        THE DEFENDANT:  All right.

15        THE COURT:  You are not to violate any federal,

16   state or local law.

17        You are to cooperate in the collection of a DNA

18   sample.

19        You are to appear in court as ordered and surrender

20   to serve any sentence.

21        You are not to possess or attempt to possess a

22   firearm, destructive device or other dangerous weapon.

23        You are not to use or possess a narcotic drug or

24   another controlled substance without a lawful medical

25   prescription, and you may not use marijuana at any time under

17

1    any circumstances.

2           You are to report to the U.S. Pretrial Services

3    office within 24 hours of your release and thereafter as they

4    direct, and you are to follow all their directions.

5           You are to advise the Court or Pretrial Services in

6    writing of your current address and phone number, and any

7    changes to your address, residence address or phone number

8    before you make them.

9           You are to read and understand the pretrial release

10   order that I am signing, and you are to read, understand and

11   sign the Advice of Penalties and Sanctions form.

12          Your travel is restricted to San Diego County, and

13   you are not to enter the Republic of Mexico at any time for

14   any reason during the pendency of your case.

15          You are to execute an appearance bond in the amount

16   of 50, five zero, thousand dollars, that is secured by a

17   trust deed to the United States on real property approved by

18   a federal judge.

19          You are to actively seek or continue full-time

20   employment or schooling or a combination of both.

21          You are to reside with a family member or at a

22   residence approved by the Pretrial Services office.

23          You are to surrender any valid passport to the

24   Pretrial Services office and not thereafter obtain a passport

25   or other international travel document.

18

1          You are to submit to psychological or psychiatric

2   treatment at Pretrial Services discretion.

3          In light of the history of trafficking and some

4   possession charges, I am imposing a condition of drug testing

5   no more than eight times per month and/or outpatient

6   substance abuse therapy and counseling as directed by the

7   Pretrial Services office.

8          I'm directing you, sir, to participate in a

9   location-monitoring program and comply with its requirements

10  as directed under the following component and technology, and

11  that's home detention.

12         You are restricted to your residence at all times

13  except for Pretrial Services approved absences for

14  employment, education, religious services, medical, substance

15  abuse, mental health treatment, attorney visits, court

16  appearances, court-ordered obligations and other activities.

17         I am leaving the technology by which you'll be

18  monitored and that condition of detention will be enforced to

19  the discretion of Pretrial Services.

20         I'm also ordering as a special condition that you

21  not use a computer or smartphone and that you not engage in

22  any activities on social media.

23         So those are your conditions of release, sir.  Is

24  there anything further, Ms. Wu?

25         MS. WU:  Yes, your Honor.  The government would

19

1    request --

2              THE DEFENDANT:  Thank you, your Honor.

3              MR. CORTEZ:  Your Honor -- hold on.

4              THE COURT:  We're not done yet, Mr. Johnson.

5              Ms. Wu.

6              MS. WU:  The government would request two additional

7    conditions to be added.  So the first is that ammunition be

8    added to the list of things that he cannot possess, starting

9    with firearms, et cetera.

10             And the second is that, based on the proffer that

11   the United States has given to this Court, I believe that it

12   is appropriate to impose a gang condition, that he not be

13   allowed to associate with any known gang members, including

14   but not limited to SPS, Aryan Brotherhood, Lakeside

15   Gangsters, Henchmen, Peckerwoods, et cetera.

16             MR. CORTEZ:  I would oppose that condition on

17   constitutionality grounds.  It's too vague and too general.

18   What, is he supposed to ask everyone if they belong to any of

19   those organizations?

20             MS. WU:  As Mr. Cortez knows, this is a pretty

21   standard gang condition that is imposed by anyone that is

22   known to be a gang member.

23             MR. CORTEZ:  As government counsel knows, I don't

24   care.  That's unconstitutional.  And I fought that issue

25   before.

20

1          MS. WU:  Unfortunately, he has not won that --

2          MR. CORTEZ:  This is not a conversation between us.

3     We'll talk later.

4          THE COURT:  All right.  I do think the condition --

5     I am going to impose those conditions.  No possession of

6     ammunition, no association with known gang members.  I do

7     think that condition should be self-enforcing based on the

8     home detention and the close monitoring by Pretrial

9     Services.

10          MR. CORTEZ:  Right.  I have one question, your

11     Honor.  Did you say he's not allowed to use a phone?

12          THE COURT:  A smartphone.

13          MR. CORTEZ:  Smartphone?

14          THE COURT:  No smartphone usage where he could

15     access the internet.

16          MR. CORTEZ:  I understand that.  We're going to

17     have -- he has to have a phone for work, to communicate with

18     me and such.  You just don't want him using the internet; is

19     that it?

20          THE COURT:  I'm sorry?

21          MR. CORTEZ:  You don't want him using the Internet;

22     is that --

23          THE COURT:  Correct.  No internet usage.

24          MR. CORTEZ:  Okay.  And we have a next court hearing

25     for motions?

21

1          THE COURT:  So the next court date that I have on my

2     calendar, Mr. Cortez, is December 14th at 11:00 a.m. before

3     Judge Houston for a motion hearing.

4          MR. CORTEZ:  Yes, sir.

5          THE COURT:  Anything further, Ms. Wu?

6          MS. WU:  No, your Honor.

7          THE COURT:  Mr. Cortez, anything further, sir?

8          MR. CORTEZ:  No, sir.  Thank you.

9          THE COURT:  Thank you.

10         MS. WU:  I'm sorry.  One clarification, your Honor.

11    Did you say this was a real property bond or personal

12    appearance bond secured by real property?

13         THE COURT:  It's a personal appearance bond secured

14    by real property.

15         MS. WU:  Thank you, your Honor.

16         MR. CORTEZ:  Thank you.

17         Mr. Johnson, call me, please.  Take care.

18         THE DEFENDANT:  Thank you very much, sir.  And thank

19    you, your Honor.

20         Are we all done?

21         THE COURT:  Yes.  You are all done, Mr. Johnson.

22    Thank you, sir.

23         THE DEFENDANT:  Thank you, your Honor.

24         (Proceedings concluded at 11:22 a.m.)

25                        -- oo0oo --

COMPUTER-AIDED TRANSCRIPTION

22

1          I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in the

3    above-entitled matter.

4
     /s/Cameron P. Kircher              12-9-20
5    Transcriber                        Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION